**THOR 725 8TH AVENUE LLC, Plaintiff,**

v.

**Shanthioa GOONETILLEKE a/k/a Martin Goonetilleke and Marie Goonetilleke, Defendants.**

**No. 14 Civ. 4968(PAE).**

United States District Court, S.D. New York.

Signed Oct. 2, 2015.

Joseph Lee Matalon, for Plaintiff.

Thomas Hoffman, Thomas Hoffman Law Offices, P.C., New York, NY, for Defendant.

## OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This lawsuit is a breach-of-guaranty action brought by a landlord. Plaintiff Thor 725 8th Avenue LLC ("Thor") sues Shanthioa Goonetilleke, a/k/a Martin Goonetilleke ("Martin"), and his wife Marie Goonetilleke ("Marie"). Thor claims that its tenant on a commercial real-estate lease, a corporate entity owned by Martin that operated an adult-video store, defaulted and that Thor thereafter properly terminated the lease, triggering a contractual guaranty signed by the Goonetillekes. Thor claims that the Goonetillekes owe it more than $2 million in past-due rent, conditional rent reductions, and real-estate taxes. The Goonetillekes deny liability.

The parties, following discovery, now move for summary judgment. For the reasons that follow, the Court grants Thor's motion and denies the Goonetillekes' cross-motion.

## I. Background[1]

### A. The Parties

Thor, a limited liability company wholly owned by citizens of New York,[2] owns the building at 725 8th Avenue, New York, NY (the "Premises"), which was purchased from the prior landlord, 725 8th Avenue Realty, LLC, on September 25, 2013. Joint 56.1 ¶ 1; *id.* at Ex. 9. The tenant under the commercial lease at issue (the "Lease") is DVD Depot Inc. ("DVD"), which is wholly owned by Martin. *Id.* at Ex. 1 ("Lease"). The Goonetillekes, who are husband and wife, and Extraordinary DVD Inc. ("EDVD"), a company owned by

Martin, are guarantors of the Lease. *Id.* at Ex. 2 ("Guaranty").

### B. Overview of Relevant Agreements and Timeline

This case involves three sets of agreements, primarily executed among the prior landlord, DVD, and defendants. To guide the reader in following the intricate factual history that follows, the Court begins with a brief overview.

The first series of agreements, executed in late 2003 and early 2004, are the Lease and Guaranty. These set out the original terms of DVD's leasehold and the Goonetillekes' guarantee of the tenant's rent to the prior landlord. After DVD defaulted on rent in 2009, the prior landlord sued the Goonetillekes, as DVD's guarantors, and DVD. That dispute was resolved through the second series of agreements— a stipulation of settlement ("Stipulation")

---

1. The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the instant motions, including the parties' Joint Rule 56.1 Statement of Undisputed Facts (Dkt. 65) ("Joint 56.1"), and the exhibits attached thereto; the Declarations of Joseph L. Matalon (Dkt. 68) ("Matalon Deck") and Allen Mukaida (Dkt. 69) ("Mukaida Deck") in support of Thor's motion for summary judgment, and the exhibits attached thereto; Thor's Rule 56.1 Statement (Dkt. 71) ("Thor 56.1"); the Declarations of Thomas Hoffman (Dkt. 75) ("Hoffman Deck"), Joel Levy (Dkt. 76) ("Levy Deck"), Martin Goonetilleke (Dkt. 77) ("Martin Deck"), and Arleen Rodriguez (Dkt. 78) ("Rodriguez Deck"), in support of defendants' motion for summary judgment, and the exhibits attached thereto; defendants' Rule 56.1 Statement (Dkt. 80) ("Defs. 56.1"); defendants' Response to Thor's Rule 56.1 Statement (Dkt. 82) ("Defs. Resp. 56.1"); the Declaration of Joseph L. Matalon (Dkt. 86) ("Matalon Reply Deck"), in further support of Thor's motion for summary judgment, and the exhibits attached thereto; Thor's response to defendants' Rule 56.1 Statement (Dkt. 87) ("Thor Resp. 56.1"); and the Declaration of Thomas Hoffman (Dkt. 90) ("Hoffman Reply

Deck") in further support of defendants' motion for summary judgment, and the exhibits attached thereto.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R.Civ.P. 56(c).").

2. *See* Dkt. 18 (Affidavit of Joseph L. Matalon, listing the citizenship of Thor's members).

and an addendum to the stipulation ("Addendum")—which formally terminated the Lease, but kept its substantive terms and the Guaranty in place; DVD continued to lease the Premises. The final series of agreements were executed in 2013 before Thor purchased the Premises from the prior landlord. They include the Tenant Estoppel Certificate ("TEC"), the Guarantors' Certification ("GC"), and the Amendment to Occupancy Agreement (the "Amendment"). These agreements set out the terms governing DVD's occupancy of the Premises, and, with minor modifications, left in place the terms of the Lease, the Stipulation, and the Addendum (collectively, the "Occupancy Agreement"). Critically important here, the Goonetillekes remained liable as guarantors, although, under the Amendment, they were to be released from the guarantee if DVD timely—and in compliance with the Occupancy Agreement—vacated the Premises pursuant either to a notice of termination by the landlord or its own notice to vacate.

Soon after Thor purchased the Premises in September 2013, DVD defaulted again in November 2013. Following this default and DVD's repeated failure to pay Thor the growing amount of back-rent due, Thor served a termination notice on DVD, which notified DVD that its occupancy was terminated effective May 7, 2014. DVD, however, did not vacate the Premises on that date. Instead, DVD, purporting to act pursuant to the Occupancy Agreement, disregarded the termination notice and gave Thor a notice of its intent to vacate, stating that it would vacate the Premises on July 7, 2014. However, DVD did not meet that self-imposed deadline, either. DVD remained in occupancy until July 14, 2014, and, upon leaving, left the premises in other than the "broom clean" condition required under the Lease.

In pursuing summary judgment, Thor contends that, based on DVD's default, it had the right to issue a termination notice to DVD, that the notice was properly served, and that DVD failed both to meet the deadline to vacate and to leave the Premises in lease-compliant condition. These lapses, Thor argues, triggered the Goonetillekes' liability under the Guaranty, and obliged the Goonetillekes to pay Thor not only DVD's unpaid rent, but also, in light of DVD's breaches, to cover five years (dating back to 2009) of conditional reductions in rent and real-estate taxes that DVD had received. The same result holds, Thor argues, even if DVD's deadline to vacate were the later one set by DVD's notice to vacate because DVD also missed that deadline.

The Goonetillekes counter that Thor's termination notice was technically defective and thus void and that DVD's notice therefore set the deadline to vacate. And, the Goonetillekes argue, although DVD failed to timely vacate the Premises even as measured under that notice—and although DVD left the Premises in a non-compliant condition—DVD came sufficiently close to meeting those contractual duties as to excuse its guarantors from liability under the Guaranty. Alternatively, the Goonetillekes argue that holding them to the Guaranty here would work a legally impermissible "forfeiture."

The Court turns first to the parties' history and the relevant agreements.

## C. Factual Background

### 1. The first series of agreements

#### i. The Lease

On January 14, 2004, DVD entered into the Lease for the Premises. The Lease, which has a 15–year term, became effective on March 1, 2004, and was to expire February 28, 2019, unless earlier terminat-

ed. Lease, Art. 3; *see also* Joint 56.1 ¶ 5. The Lease was:

a net lease; accordingly, it is the purpose and intent of Landlord and [DVD] that the Rent shall be absolutely net to Landlord, so that this Lease shall yield, net to Landlord, the Rent specified in Article 4 hereof in each year during the Lease Term, and that all costs and expenses of every nature and description relating to the Demised Premises or [DVD's] use thereof which may arise or become due during the term of the Lease Term shall be paid by [DVD].

*Id.* Art. 5.A. DVD's monthly rent began at $40,000; the Lease included a rent schedule, with the rent due by DVD to increase annually. *Id.* Art. 4.A. DVD also was responsible for "100% of all real estate taxes." *Id.* Art. 6.A.

The Lease stated that the rent must be paid "without any set-off or deduction whatsoever." *Id.* Art. 4.B. Under the Lease, if DVD failed to pay rent or additional rent when due, and the failure continued for five days, this constituted an "Event of Default." *Id.* Art. 18.A.1–2.[3] The Lease provided that, upon an Event of Default, the landlord:

shall have the right to give [DVD] a five (5) day notice of Landlord's termination of this Lease; and upon the fifth (5th) day net succeeding the giving of such notice, this Lease and the estate hereby granted shall expire and terminate on such date as fully and completely and with the same effect as if such date were the date herein fixed for the expiration of the Lease Term ... and on such date [DVD] shall quit and peacefully surrender the Demised Premises back to Landlord.

*Id.* Art. 18.B. Further, the landlord, in light of an Event of Default and prior to serving a lease termination notice, had:

the right to give [DVD] a five (5) day notice terminating [DVD's] right of possession of the Demised Premises; and upon the fifth (5th) day next succeeding the giving of such notice, [DVD's] right of possession of the Demised Premises will, without any further notice or action by Landlord, end and terminate; and on such date [DVD] shall quit and peacefully surrender the Demised Premises back to Landlord.

*Id.* Art. 18.C.

Under the Lease, any notice or communication between the parties, including the five-day notice of termination, was to be in writing; it could be sent by certified mail, return receipt requested, or by overnight courier. *Id.* Art. 30. The address identified for DVD under the Lease was 278 McCloud Drive, Fort Lee, New Jersey (the "Fort Lee address"). *Id.* at 1; *see also* Joint 56.1 ¶ 17. DVD and the landlord could change their notice addresses "by giving notice of such change to the other party by notice given" in the aforementioned described manner. *Id.* Art. 30.

Further, the Lease provided, "[u]pon the expiration or prior termination of the Lease Term, [DVD] shall vacate and surrender the Demised Premises to Landlord vacant and broom clean and in good order and repair, ordinary wear and tear excepted." *Id.* Art. 7.D; *see also id.* Art. 29.A ("Tenant shall surrender the Demisted Premises to Landlord upon the expiration or sooner termination of this Lease, vacant and broom clean and in at least the condition as same had been upon the execution

---

**3.** Under the Lease, if DVD failed to pay rent, a 5% late charge of the amount overdue would "become immediately due and payable and shall be deemed additional rent hereunder." Lease Art. 4.C. Rent arrears and additional rent bore an interest rate of 1.5% per month. *Id.*

and delivery hereof, reasonable wear and tear excepted."). The Lease also provided that:

No expiration or termination of this Lease ... shall relieve Tenant of any of its liabilities and obligations hereunder, including without limitation the liability for Rent and additional rent for the entire stated term of this Lease, all of which shall survive such expiration, termination, repossession and/or re-letting of any of the Demised Premises.

*Id.* Art. 18.E. Finally, the Lease provided that, "[s]imultaneously upon execution of this Lease," defendants and EDVD would execute a "joint and several 'good guy' guaranty," *id.* Art. 41, which the Court now describes.

## ii. The Guaranty

On December 22, 2003, the Goonetillekes executed the Guaranty. Under it, the guarantors (the Goonetillekes and Martin, as president of EDVD):

jointly and severally unconditionally guarantee[ ] to Landlord ... the full and prompt payment of all amounts payable by [DVD] and the full and timely performance and observance of all the covenants, terms, conditions and agreements therein provided to be performed and observed by [DVD] under the Lease and the unamortized balance of the real estate brokerage commission paid by Landlord upon execution of the Lease, as amortized on a straight line basis over the entire term of the Lease.

Guaranty at 1. The guarantors' liability would be limited as follows, however, if certain conditions were met:

[I]f [DVD] elects to vacate the Demised Premises and deliver possession thereof to Landlord in vacant, broom clean condition prior to the expiration date of the Lease and in accordance with all other terms and conditions of the Lease (such date of vacatur shall hereafter be referred to as the "Actual Vacate Date") and provided that [DVD] and Guarantor furnishes Landlord with not less than six (6) months but not more than one (1) years prior written notice of [DVD's] intended Actual Vacate Date (the "Noticed Vacate Date"), then Guarantors' liability shall be limited to the following: (i) the unamortized balance of the real estate brokerage commission paid by Landlord upon execution of the Lease as amortized on a straight line basis over the entire term of the Lease, and (ii) all liability that shall have accrued up to and including the Actual Vacate Date. It being the express intention of the parties that this Guaranty shall terminate on the Actual Vacate Date with respect to all liability of [DVD] which shall accrue after the Actual Vacate Date.

*Id.* But, the Guaranty stated, if DVD failed to provide the landlord with notice of the Noticed Vacate Date or failed to vacate the Premises in accordance with the Noticed Vacate Date:

(i) this Guaranty shall remain in full force and effect through the date which is six (6) months after the Actual Vacate Date; and (ii) rent shall accrue and [the Goonetillekes] shall guaranty [DVD's] payment of additional rent at a rate equal to two (2) times the highest rent provided for in the Lease.

*Id.*

## 2. The second series of agreements

### i. The Stipulation

In 2009, the prior landlord initiated a landlord-tenant lawsuit against DVD and the Goonetillekes (the latter, in their capacities as guarantors), in New York City

Civil Court.[4] In July 2009, the parties resolved that dispute by entering a stipulation of settlement and executing an addendum. Joint 56.1, Ex. 3 ("Stipulation"); *id.* at Ex. 4 ("Addendum").

Under the Stipulation, the parties agreed that DVD was "in sole possession of the Premises." Stipulation ¶ 4. Further:

> The Lease and tenancy are terminated effective immediately. [DVD] and [the Goonetillekes] however shall continue to be responsible as per the Lease and Guaranty to [the prior landlord] for the payments required therein, as modified by the Addendum to this stipulation.

Stipulation ¶ 6; *see also id.* ¶ 9.[5] DVD continued to occupy the Premises subject to the Lease's terms, as incorporated by the Stipulation and subject to modifications in the Addendum. The Stipulation also provided that:

> In the event of a default under this Stipulation, the Addendum or the terms of the Lease by any of the Respondents [DVD and the Goonetillekes], the [prior landlord] may accelerate issuance and execution of the warrant upon five (5) days written notice sent to the Respondents' attorney by Certified Mail (with or without a Return Receipt Requested), Federal Express, USPS Express Mail or messenger. Notice shall be effective as follows: on the third business day if sent by Certified Mail; on the next business day or the third business day if sent by Federal Express, USPS Express Mail;

and on the same business day if sent by messenger.

> \*    \*    \*

> In the event of a default under this Stipulation by any of the Respondents, the [prior landlord] shall be entitled, in addition to any other remedies, to a judgment jointly and severally against DVD DEPOT INC., SHANTHIOA GOONETILLEKE a/k/a MARTIN GOONETILLEKE, MARIE GOONE-TILLEKE and EXTRAORDINARY DVD INC. for rent and additional rent due under the Lease, this stipulation and the separate agreement incorporated herein and for [the prior landlord's] attorneys['] fees incurred in this proceeding ... This Court [New York Civil Court] shall retain jurisdiction to enforce the terms of this Stipulation.

*Id.* ¶¶ 7, 10 (capitalization in original). Finally, the Stipulation stated that DVD and the Goonetillekes:

> agree and acknowledge that **"TIME IS OF THE ESSENCE"** for [DVD and the Goonetillekes] to comply with all the terms and conditions of this stipulation within five (5) business days of the [sic] any date for performance by [DVD] except that there is no such five (5) business day grace period for any monetary payment which is due or for the date of [DVD] to vacate.

*Id.* ¶ 13 (capitalization and emphasis in original).

### ii. The Addendum

As for the Addendum, it was signed by the prior landlord; Martin, in his capacity

---

4. The case was *725 8th Avenue Realty LLC v. DVD Depot Inc.*, L & T Index No. 076843/2009. *See* Stipulation; *infra* TEC ¶ 14.

5. Specifically, the Stipulation stated that DVD and the guarantors "shall comply with all obligations of the Lease, Guaranty and Tenancy, except as otherwise provided in this Stipulation and any Addendum or separate written agreement incorporated herein." Stipulation ¶ 9.

as president of DVD; and the Goonetillekes, in their capacities as guarantors of the Lease. It (1) reiterated that the Goonetillekes had agreed to the Guaranty and (2) reduced DVD's annual rent. *See* Addendum ¶ 2. Significantly here, upon an Event of Default,[6] the rent and taxes were to be reverted to those set under the Lease (*i.e.,* the reduced monthly rent under the Addendum would not apply), and, also significant, "a sum equal to the difference between the original rent and taxes set forth in the Lease ... shall become immediately due and payable." *Id.* ¶ 2.C.

As to the Guarantors, the Addendum provided:

> In the event Guarantors give notice under the Limited Guaranty of. a Noticed Vacate Date then in such event a sum equal to the difference between the original rent schedule and taxes set forth in the Lease, without regard to the within modification of same, from and after May 1, 2009 shall become immediately due and payable.

*Id.* ¶ 7.

The Addendum also provided that the landlord, by entering into this agreement, did not "waive or forgive any other condition with respect to the Lease." *Id.* ¶ 9. Finally, the Addendum provided that:

> Except as expressly modified or amended by the stipulation and this Addendum, [DVD] and the Guarantors shall be bound by and obligated to perform all of the terms, covenants and conditions of the Lease and the Guaranty and all references to the Lease in any future correspondence or notice shall be deemed to refer to the Lease as modified by this Agreement.
>
> All understandings and agreements heretofore had between the parties are

merged into the stipulation and this Addendum, which alone fully and completely expresses the agreement of the parties, no party relying upon any statement or representation not embodied in the Lease, the stipulation or this Addendum. The stipulation, Lease and/or this Addendum shall not be modified in any way except by a writing subscribed by the Landlord and [DVD], which the Guarantors will be bound by whether or not the Guarantors execute such writing.

*Id.* ¶¶ 11–12.

### 3. Thor's purchase of the Premises and the third series of agreements

On September 25, 2013, Thor bought the Premises from the prior landlord. Before Thor's purchase, DVD and the Goonetillekes executed a number of documents, including the Tenant Estoppel Certificate, Joint 56.1, Ex. 5 ("TEC"); the Guarantors' Certification attached to Tenant Estoppel Certificate of DVD Depot Inc., *id.* at Ex. 6 ("GC"); and the Amendment to Occupancy Agreement, *id.* at Ex. 7 ("Amendment"). Collectively, these reaffirmed that the Goonetillekes' duties to the prior landlord in their capacity as guarantors would henceforth be owed to Thor, while modifying discrete terms.

#### i. The TEC

The TEC, executed by Martin as president of DVD, acknowledged that the Lease, the Stipulation, and the Addendum together (collectively, the "Occupancy Agreement") formed DVD's "entire agreement between the parties as to the Premises." TEC ¶ 1. It provided that (1) the prior landlord was not holding any security deposit from DVD because it had applied

---

6. The Addendum extended the period of failure to pay to result in an Event of Default from five days in the Lease to 15 days. Addendum ¶ 4.

the security deposit on amounts DVD owed the prior landlord under the Lease, and (2) DVD had no right to terminate the Lease. *Id.* ¶¶ 10–11.

### ii. The GC

The GC, executed by the Goonetillekes in their capacities as guarantors, stated that the Guaranty "is in full force and effect and has not been amended or modified except as set forth in [the] Amendment to Occupancy Agreement."

### iii. The Amendment

The Amendment to Occupancy Agreement (the "Amendment") was executed by DVD, the prior landlord, and Thor. It provided that the Lease, Stipulation, and Addendum collectively constituted the "Occupancy Agreement," which "represents the entire agreement between the parties as to the Premises" except as modified by the Amendment itself. Amendment at 1. The Amendment recognized that the Lease had been terminated pursuant to the Stipulation, but that DVD "remains in possession of the Premises pursuant to the Occupancy Agreement." *Id.* The Amendment modified the notice required for DVD to vacate the premises and to thereby release the Guarantors from liability:

> The notice by [DVD] to vacate the Premises and deliver possession thereof as set forth in lines 7 and 8 of the second paragraph of the Guaranty shall be amended to require not less than one (1) month but no more than six (6) months prior written notice. In the event [DVD] timely vacates and surrenders the Premises pursuant to said notice and the Guaranty, the Guarantors will be released from said liabilities under the Guaranty.

*Id.* ¶ 3.

Finally, the Amendment provided that:

[The prior landlord] has not, as of the date hereof, entered a judgment against the Guarantors. [The prior landlord] and [Thor] shall not enter a judgment or seek any liability against Shanthioa Goonetilleke, Marie Goonetilleke and Extraordinary DVD, Inc., or either of them, unless [the prior landlord], [Thor] or [DVD] terminates the Occupancy Agreement pursuant to the terms thereof and [DVD] does not actually, voluntarily and timely vacate the Premises, without execution of a warrant or use of self-help, and otherwise in accordance with the Occupancy Agreement.

*Id.* ¶ 4.

### 4. DVD's defaults and Thor's subsequent notices of default and termination

Although required to pay the November 2013 monthly rent ($39,392.80) by November 16, 2013, DVD did not pay that rent. This triggered an Event of Default. Joint 56.1 ¶ 34; *id.* at Ex. 18. From that point forward, although DVD made occasional payments towards rent, its rent arrears gradually grew, to the point where, as of May 7, 2014, when it made its last payment, it owed $322,051.19 in back rent. *Id.* at Ex. 18.[7] From that point forward, DVD's back rent grew by $39,392.80 per month through July 14, 2014, when DVD's total rent due reached $403,836.79. *See id.* ¶ 101.

On January 31, 2014, Thor served a default notice, stating that DVD owed $58,785.60 (the "First Default Notice"). *Id.* at Ex. 8. The First Default Notice, sent by certified mail to DVD at the Fort Lee address listed in the Lease, stated that:

---

**7.** The total rent arrears represents the sum of the amount DVD owed in past-due rent to the prior landlord as of September 18, 2013 ($189,479.99) and the amount DVD owed in past-due rent to Thor as of May 7, 2014 ($135,571.20). Joint 56.1 ¶ 101; *id.* at Ex. 18.

[I]f such default is not cured on or before **February 18, 2014,** which date is at least **fifteen (15)** days from the date this notice shall be deemed to have been given, [Thor] will seek all applicable remedies available under the Lease, including the right to re-enter the Premises and declare the Lease, and the tenancy thereby created, terminated, and remove all persons and property from the Premises, with or without the process of any court, and such re-entry shall not relieve [DVD] or any guarantor of the Lease for all liability thereunder, all as provided under **Article 18** of the Lease.

*Id.* (emphasis in original). The First Default Notice further stated that **"Article 26** of the Lease provides for payment of reasonable attorney's fees if Landlord is required to retain the services of an attorney in connection with Tenant's default. Notice is hereby given that [Thor] intends to enforce the provisions of the Lease." *Id.* (emphasis in original).

On April 4, 2014, Thor served a second default notice. It notified DVD that it now owed $132,571.20. Joint 56.1, Ex. 9 (the "Second Default Notice."); *id.* ¶ 63. The Second Default Notice was sent to the Premises via hand delivery, certified mail with return receipt requested, and Federal Express. *Id.* at Ex. 9. The notice also stated that:

If [DVD] shall fail to timely pay the foregoing amount in full, an "Event of Default" under the document titled "Triple Net Lease" shall be deemed to have occurred. Pursuant to Section 18(B) thereof, [Thor] shall then be entitled to terminate your occupancy on 5 days' notice. [Thor] intends to do so.

*Id.*

Finally, on April 24, 2014, Thor sent a notice of termination (the "Termination Notice"). Joint 56.1, Ex. 10. This notice also was sent to the Premises via hand delivery, certified mail with return receipt requested, and Federal Express. *Id.* ¶ 68. The Termination Notice stated:

**PLEASE TAKE NOTICE** that [DVD] has failed to cure the defaults set forth in the Notice of Default dated April 4, 2014.

**PLEASE TAKE FURTHER NOTICE** that an "Event of Default" under the document titled "Triple Net Lease" has occurred. Pursuant to Section 18(B) thereof, [Thor] is entitled to terminate your occupancy on 5 days' notice.

**PLEASE TAKE FURTHER NOTICE** that [Thor] hereby elects to terminate your occupancy effective 11:59 p.m. on May 7, 2014, which date and time is more than 5 days from the date you have received this Notice. If you have not voluntarily vacated, [Thor] intends to re-enter the premises at any time thereafter.

*Id.* at Ex. 10, at 1–2 (capitalization and emphasis in original).

### 5. DVD's vacate notice and departure

On May 8, 2014, DVD faxed a letter to Joseph Lee Matalon, a vice president of Thor (also Thor's counsel). Joint 56.1, Ex. 11. This letter described itself as DVD's notice to vacate. It stated:

In accordance with [the] Occupancy Agreement dated September 18 th 2013 with regard to the above entitled premises this is to serve as notice that the tenant will vacate the above entitled premises[.] [T]his is to serve as notice that the tenant will vacate the above premises on July 7th, 2014 (60 days from the date hereof)[.]

We require said time to clean out the store and relocate the property located in said store.

*Id.*

On July 15, 2014, Martin hand-delivered a letter to a security guard at Thor's of-

fices; the letter included keys to the Premises. Joint 56.1, Ex. 12; *id.* ¶ 81. The letter, dated July 9, 2014 and signed by Martin, stated:

> In accordance with prior correspondent and notice this is to acknowledge and confirm that the above tenant has vacated the above store and delivered possession of same to the Landlord on July 7[,] 2014.
>
> We have requested information as to whom to deliver the keys to or if someone will pick them up, but have received no response[.] [A]ccordingly we are delivering all keys with this letter.
>
> In addition pursuant to the stipulation previously executed it is understood that as a result of this vacation and surrender of the premises pursuant to our notice that the Guarantors will be released from said liabilities under the Guaranty.

*Id,* at Ex. 12.

Although the July 9, 2014 letter represented that DVD had delivered possession of the Premises on July 7, 2014, the parties agree that DVD "physically occupied the Premises through July 14, 2014." *Id.* ¶ 90.

When DVD vacated the building, it left the following items at the Premises: nine or 10 television screens, a refrigerator, metal shelving fixtures, about 50 units of DVD players, and boxes of merchandise. *Id.* ¶ 91; *see also id.* at Exs. 13–14 (photos of Premises). Thor retained an outside contractor, Manhattan CG, to remove items that had been left on the Premises, and paid $10,778.63 for the light demolition and removal of items that were left at the Premises. *Id.* at Ex. 17; *id.* ¶ 96.

### D. Procedural History

On July 2, 2014, Thor filed this action against the Goonetillekes for breach of guaranty and costs of enforcement. Dkt. 2 ("Compl."). Thor seeks to recover $2,067,288.99, pursuant to the Goonetillekes' guaranty of DVD's obligations under the lease. *Id.* ¶ 2; Joint 56.1 ¶ 115. This sum represents the total of three items, the quantification of each of which the parties agree to. These are:

*Rent arrears:* As of July 14, 2014, DVD owed rent arrears totaling $403,836.79;

*Recoupment of rent reduction:* Between May 2009 and July 2014, the rent reduction which DVD had gained under the 2009 Addendum had reduced its total rent by $778,757.45; and

*Recoupment of real-estate tax payments:* Between May 2009 and July 2014, the real-estate tax reduction which DVD had gained under the 2009 Addendum had reduced its total taxes by $884,694.75. *Id.* ¶¶ 101, 106, 113.[8]

On June 12, 2015, following discovery, Thor moved for summary judgment on its breach of guaranty claim, Dkt. 67, and filed a supporting memorandum of law, Dkt. 70 ("Thor Br."). On June 26, 2015, the Goonetillekes moved for summary judgment, Dkt. 74, and filed a memorandum of law supporting their motion and opposing Thor's, Dkt. 81 ("Defs. Br."). On July 24, 2015, Thor filed a memorandum in further support of its motion and in opposition to defendants', Dkt. 85 ("Thor Reply Br."). On August 7, 2015, the Goonetillekes filed a reply. Dkt. 93 ("Defs. Reply

---

8. The Goonetillekes' opening brief did not concede that the damages are $2,067,288.99; they argued that Thor had not given them credit for the $131,246.02 security deposit that the prior landlord held. Defs. Br. 30. That argument, however, proved incorrect, because that security deposit had earlier been applied to DVD's previous rent arrears. *See* TEC ¶ 10. Thus, the Goonetillekes, if found liable on the Guaranty, owe Thor $2,067,288.99.

Br."). On September 2, 2015, the Court heard argument. ("Tr.").

## II. Discussion

### A. Legal Standards Applicable to Summary Judgment Motions

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir.2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R.Civ.P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir.2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir.2003)).

### B. Analysis of Thor's Claim for Breach of Guaranty

In pursuing summary judgment, Thor argues that undisputed facts establish a breach of guaranty. That is because the Goonetillekes were bound by the Guaranty, DVD owed Thor a debt (more than $2 million in past-due rent, rent reductions, and real-estate taxes) covered by the Guaranty, and DVD did not vacate the premises in a manner that released the guarantors from liability under Paragraphs 3 and 4 of the Amendment.

The Goonetillekes do not dispute that they were bound by the Guaranty. But, they argue, they do not owe Thor under it, for two reasons. *First*, they argue, DVD timely and properly vacated the Premises, consistent with Paragraphs 3 and 4 of the Amendment, and therefore did not trigger liability under the Guaranty. Thus, although DVD has a debt to Thor, the Goonetillekes do not. This argument is largely based on the claim that Thor's notice of termination was defective and void, such that the deadline for DVD to vacate was set not by that notice, but by DVD's later notice to vacate. And, the Goonetillekes argue, although DVD vacated the premises after the deadline set in its notice to vacate and not in "broom clean" condition as required, it came close enough to complying with those requirements that it ought not trigger the Guaranty. *Second*, they argue, the $2 million-plus in damages that Thor pursues, which includes five years of conditional rent and tax reductions voided as a result of DVD's breaches, is an impermissible "forfeiture," which should not be enforced. The Court reviews these claims in order.

Under New York law, "[a] guaranty must be construed in the strictest manner." *VW Credit, Inc. v. Big Apple Volkswagen, LLC*, No. 11 Civ.1950(PAE),

2012 WL 919386, at *4 (S.D.N.Y. March 15, 2012) (quoting *Davimos v. Halle*, 35 A.D.3d 270, 272, 826 N.Y.S.2d 61 (1st Dep't 2006)). "[A]ll that the creditor need prove is an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty." *City of New York v. Clarose Cinema Corp.*, 256 A.D.2d 69, 71, 681 N.Y.S.2d 251 (1st Dep't 1998); *see also Sidley Holding Corp. v. Morton Ruderman*, No. 08 Civ. 2513(WHP), Dkt. 25, at 10 (S.D.N.Y. Sept. 26, 2008) (bench opinion) (citing *Citicorp Leasing, Inc. v. United Am. Funding, Inc.*, No. 03 Civ. 1586(WHP), 2005 WL 1847300, at *4 (S.D.N.Y. Aug. 5, 2005)).

Thor has established the first element of a breach of guaranty claim. It is undisputed that the Guaranty is authentic and that the Goonetillekes signed it. They there "jointly and severally unconditionally guarantee[d] to [Thor]," *inter alia*, "the full and prompt payment of all amounts payable by [DVD]" and the full and timely performance of all of DVD's other obligations under the Lease. Guaranty at 1. The Court therefore turns to the arguments as to why they owed no debt under the Guaranty.

**1. Thor's termination notice was valid**

Under the Occupancy Agreement, after an Event of Default, Thor had the right to provide DVD with a five-day notice that it was terminating the Occupancy Agreement. On the fifth day after the notice, the Occupancy Agreement would terminate, and DVD would be required to quit and peacefully surrender the Premises to Thor. Lease Arts. 18.B–C. The termination notice was required to be in writing, and sent by certified mail, return receipt requested, or by overnight courier, to DVD's address listed in the Occupancy Agree-

ment: 278 McCloud Drive, Fort Lee, New Jersey. *Id.* at 1; *id.* Art. 30.

The Goonetillekes do not dispute that there was an Event of Default supporting issuance of a notice of termination.[9] And they acknowledge that DVD actually received that notice. But the Goonetillekes challenge the termination notice as technically deficient, and therefore invalid, on two grounds.

**i. Incorrect address**

■ *First*, the Goonetillekes argue, the notice was deficient because it was sent to the Premises, not to the Fort Lee address listed in the Occupancy Agreement. Defs. Br. 6–10. The address provision of that Agreement, they argue, is a condition that must be strictly followed for Thor to terminate. *Id.* at 8. And, they posit, the Fort Lee address may have been chosen in lieu of the Premises because Martin often traveled to his native Sri Lanka, and his wife Marie "never went to the Tenant's place of business." *Id.* at 7. Therefore, they urge, delivery to the Fort Lee address served to assure that one Goonetilleke received the landlord's notices. *Id.*

■ Thor counters that, under New York law, notwithstanding a contractual notice provision that specifies an address, actual notice elsewhere is effective, so long as the notified party does not claim prejudice from receiving notice at the non-contractual location. Thor Br. 14. Thor correctly recites the law: "[S]trict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation." *Baygold Assocs., Inc. v. Congregation Yetev Lev of Monsey, Inc.*, 81 A.D.3d 763, 764, 916

---

**9.** DVD's non-payment of its rent obligations between November 2013 and July 2014, in fact, embraced multiple Events of Default.

N.Y.S.2d 639 (2d Dep't 2011) (quoting *Fortune Limousine Serv., Inc. v. Nextel Commc'ns*, 35 A.D.3d 350, 353, 826 N.Y.S.2d 392 (2d Dep't 2006)); *see also Suarez v. Ingalls*, 282 A.D.2d 599, 600, 723 N.Y.S.2d 380 (2d Dep't 2001) ("Strict compliance with the contract notice provisions was not required because the plaintiff does not claim that she did not receive actual notice, or was prejudiced by the deviation."); *Baker v. Norman*, 226 A.D.2d 301, 304, 643 N.Y.S.2d 30 (1st Dep't 1996) ("Strict compliance with the contract's notice provisions was not required, for defendants do not claim that they did not receive actual notice or that they were in any way prejudiced as a result of this minimal deviation.") (quoting *Dellicarri v. Hirschfeld*, 210 A.D.2d 584, 585, 619 N.Y.S.2d 816 (3d Dep't 1994)).

Here, it is undisputed that DVD actually and timely received Thor's termination notice. Martin, DVD's president and owner, admitted that in "early May" 2014, he received the notice of termination. Martin Decl. ¶ 18.[10]

Under New York law, then, unless prejudice is shown from the fact that notice was given at a site not specified in the contract, the Goonetillekes' challenge to the site of notice fails. The Goonetillekes claim prejudice to them—in their capacity as guarantors. *See* Defs. Br. 14 ("The Notice Sent to the Wrong Address Preju-

diced the Guarantors."); Defs. Reply Br. 12 ("[T]he delay in receiving notice prejudiced the defendants."). They note that Marie, a guarantor, did not receive actual notice.

That argument is unpersuasive, for two reasons. First, under the Occupancy Agreement, the termination notice was to be served on *DVD*. The contract did not require Thor to serve the termination notice on the *guarantors*. Lease Art. 30; *see also* Tr. 13–14. And, so long as the party that receives the actual notice does not claim prejudice, "[s]trict compliance with the contract's notice provisions [is] not required." *Baker*, 226 A.D.2d at 304, 643 N.Y.S.2d 30. DVD, which is not a party to this case, has not claimed prejudice here by the delivery of the notice to the Premises. And any such claim of prejudice would be unavailing, given the admission of DVD owner Martin that he actually received the notice of required termination by early May 2014.

Second, defendants' theory that they were prejudiced by Marie's not receiving the notice at the Fort Lee address does not withstand scrutiny. Defendants argue that had notice come to Fort Lee on April 24, 2014, Marie would have sought legal advice earlier, resulting in DVD's sending a notice to vacate before May 7, 2014. Defs. Br. 23. But that act would not have extinguished or affected the guarantors'

---

10. The evidence also showed that a lower-ranking DVD employee named "Neil" received the termination notice at DVD's Premises on April 24, 2014. Allen Mukaida, a paralegal at Matalon Shweky Elman PLLC, the law firm that represents Thor, attested, without contradiction, that, on that day, he served a copy of the notice on DVD by (1) mailing a copy of it via certified mail with return receipt requested, (2) mailing it via Federal Express overnight delivery, and, relevant here, (3) hand-delivering it to the Premises, which was accepted by a person who identified himself as "Neil." Mukaida Decl.

¶¶ 5–7. Neil, defendants admit, was a DVD employee. Defs. Resp. 56.1 ¶¶ 11, 17. Thor therefore argues that the date of actual notice should be treated as April 24, 2014. For purposes of resolving the pending motions, however, the Court disregards Neil's acceptance of the notice because the choice of the Fort Lee address in the Occupancy Agreement logically connotes that the parties intended the DVD owner who lived there, Martin, as opposed to a worker at DVD's adult-video-store Premises, to receive such notices for DVD.

liability. Under the Guaranty and the later Amendment, to free the defendants from their guarantee, DVD had to serve its notice to vacate at least one month before the vacate date, which also had to be before the termination of the Occupancy Agreement. Guaranty 1; Amendment ¶ 3. Even if DVD had served a notice to vacate on April 24, 2014—prompted by Marie's receipt of Thor's termination notice—DVD's vacate date under its notice would have fallen on May 24, 2014, long after the May 7, 2014 date when it was already obliged to surrender the Premises and after the Occupancy Agreement had been terminated. An earlier notice to vacate, thus, would have done nothing to eliminate the guarantors' liability.[11]

### ii. Capacity of signatory

**■** *Second*, the Goonetillekes argue, the notice was invalid because the signature on it was illegible and the signatory's "capacity to issue the Notice was not apparent." Defs. Br. 29. They argue that under *Siegel v. Kentucky Fried Chicken of Long Is.*, 108 A.D.2d 218, 488 N.Y.S.2d 744 (2d Dep't 1985), the notice was invalid because the authority of its issuer to terminate was uncertain. Defs. Br. 29–30.

*Siegel*, however, is factually far afield. There, the tenant defaulted, and the landlord's attorney sent a letter to the tenant, identifying himself as the landlord's attorney and informing the tenant of his default, and then sent a notice of termination to the tenant. 108 A.D.2d at 219, 488 N.Y.S.2d 744. But, under the lease between the landlord and tenant, only the landlord had the right to serve his tenant with a default notice. *Id.* And the landlord's attorney was not the attorney listed in the lease as representing the landlord. This, the Appellate Division reasoned, supported the tenant's claim that the attorney who sent the notice of termination should have clearly stated his authority to bind the landlord by issuing a termination notice. *Id.* at 221, 488 N.Y.S.2d 744. Because the landlord's attorney was not identified in the lease and because the termination notice was not authenticated or accompanied by proof of the attorney's authority to act for the landlord, the termination notice was inadequate. *Id.* at 223, 488 N.Y.S.2d 744.

The facts here are different. The Occupancy Agreement specifies that, after an Event of Default, Thor has the right to submit a termination notice to DVD. And

---

11. A separate issue—not raised by the Goonetillekes—is presented by the timing of DVD's receipt of the notice. Martin attested that he received the notice to terminate in "early May 2014." Martin Deck ¶ 18. The notice advised DVD that under the lease, Thor was entitled to terminate on five days' notice, and stated that Thor intended to terminate occupancy and reenter the premises on May 7, 2014. Termination Notice 1–2. Assuming—as the Court must on Thor's motion for summary judgment—that DVD did not receive actual notice before "early May," the five-day notice period would have expired after the date (May 7, 2014) when Thor stated it intended to reenter. (Specifically, Martin stated that immediately upon receiving the termination notice he took it to his attorney, Joel Levy, who "immediately sent" Thor the notice to vacate, dated May 8, 2014. Martin Deck ¶¶ 18–20. Therefore, DVD could have received Thor's termination notice as late as May 8, 2014.) The Court has *sua sponte* considered whether the fact that Martin may have received the termination notice after the reentry date that it recited invalidated the termination notice. It did not. The notice clearly and correctly stated that Thor's contractual right was to terminate five days after notice to DVD; it thus put DVD (per Martin) on notice that the five-day clock, as of that moment, had begun to run. *See* Tr. 12–14. Therefore even viewing the facts in the light most favorable to defendants, the latest date by which DVD could vacate the Premises was May 13, 2014. But DVD did not vacate until July 14, 2014.

the termination notice to DVD was explicitly from Thor—unlike in *Siegel*, where the notice came from an unknown attorney of uncertain authority. And the record reflects that Martin was aware that Matalon—who was a Thor executive as well as a practicing attorney—had authority to act for Thor. Before sending the termination notice, Thor had sent DVD two default notices; the second, sent to the Premises on April 4, 2014, was, like the termination notice, signed by Matalon. Martin did not question Matalon's authority to issue the default notice; rather, as he admitted, after receiving it, he twice paid Thor some money toward DVD's rent arrears.[12]

Under these circumstances, *Siegel* is inapposite. And, having received and acted on the default notices that immediately preceded the notice of termination, Martin cannot credibly shrug off the termination notice as lacking indicia of authenticity. The termination notice, in fact, expressly referenced at the outset the April 4, 2014 notice of default whose authenticity Martin had recognized. Nor, finally, can the Goonetillekes elude the notice by challenging Matalon's penmanship, for the notice said, and its context confirmed, that it plainly came from Thor. The Termination Notice plainly states, at the top of the notice:

TO: DVD Depot, Inc. ("Occupant")

FROM: Thor 725 8th Avenue LLC ("Owner")

Termination Notice 1. On the second page, at the end of the Termination Notice, there is an "Authorized Signatory" line with, the parties do not dispute, Matalon's signature. *Id.* at 2; Joint 56.1 ¶ 67.

Above his signature, it states "THOR 725 EIGHTH AVENUE LLC." *Id.* The Occupancy Agreement did not require any more. Indeed, it did not require that the landlord's termination notice contain a signature at all. Rather, the Occupancy Agreement simply stated that, upon an Event of Default, "Landlord shall have the right to give Tenant a five (5) day notice of Landlord's termination of this Lease," Lease Art. 18.B, and a notice "shall be in writing" and delivered via certain approved methods to the addresses specified in the agreement, *id.* Art. 30.

To the extent the Goonetillekes dispute liability under the Guaranty based on alleged deficiencies in the termination notice, that argument, therefore, fails. Based on the undisputed facts, the termination notice was valid.

### 2. DVD vacated the Premises in an untimely and non-compliant manner

The Goonetillekes alternatively argue that even if Thor's termination notice was valid, the timing and manner by which DVD vacated sufficed to release it from the Guaranty, pursuant to Paragraphs 3 and 4 of the Amendment. The Court holds otherwise, because, based on the undisputed evidence, DVD's surrender of the Premises was neither "timely" nor "in accordance with the Occupancy Agreement" and the Guaranty, as those provisions required.

■ As to the Goonetillekes' claim of timeliness: the termination notice gave DVD until May 7, 2014 to vacate and surrender the Premises. DVD undisputedly vacated on July 14, 2014, *i.e.*, 68 days

---

12. Martin attested that, in April 2014, after returning from Sri Lanka, he went to the Premises, where an employee gave him the Matalon-signed April 4, 2014 default notice. Martin Decl. ¶ 16. Because he did not have $132,000 to apply towards the rent arrears, Martin—in response to that notice—on April 14, 2014, mailed Thor a check for $14,392, and on May 7, 2014, mailed Thor a second check, for $22,000. *Id.* ¶ 17; *see also* Joint 56.1, Ex. 18.

later. To be sure, on Thor's motion for summary judgment, the Court must view the evidence in the light most favorable to the Goonetillekes. The Court therefore assumes that DVD (via Martin) did not actually receive the termination notice until "early May." But even construing "early May" to mean May 8, DVD had only until May 13, 2014, to surrender the Premises. July 14, 2014 falls 62 days later than that.

Paragraph 4 of the Amendment required DVD to "timely" vacate the premises:

> [The prior landlord] has not, as of the date hereof, entered a judgment against the Guarantors. [The prior landlord] and [Thor] shall not enter a judgment or seek any liability against Shanthioa Goonetilleke, Marie Goonetilleke and Extraordinary DVD, Inc., or either of them, unless [the prior landlord], [Thor] or [DVD] terminates the Occupancy Agreement pursuant to the terms thereof and [DVD] does not actually, voluntarily and timely vacate the Premises, without execution of a warrant or use of self-help, and otherwise in accordance with the Occupancy Agreement.

Amendment ¶ 4. The Goonetillekes argue that the timeliness requirement of this paragraph is met provided that the tenant vacated without the need for "a warrant or use of self-help." But that is not a correct reading of Paragraph 4—its text clearly requires both that DVD timely vacate the premises *and* that DVD have done so without the need for a warrant or self-help. Paragraph 4 cannot fairly be read to mean that the Goonetillekes are released from their Guaranty no matter how delinquent DVD's surrender was, so long as Thor was

not compelled—itself or via legal process—to obtain this result by physical compulsion.

■ The Goonetillekes alternatively argue that the Paragraph 4 term "timely" does not mean within five days of receipt of the termination notice. Instead, they argue, it means a departure "reasonably" soon after that contractual deadline. But the Occupancy Agreement, and Paragraph 4 of the Amendment in particular, do not so qualify the word "timely." And the Stipulation, which is part of the Occupancy Agreement, is expressly to the contrary: It contains a clause that provides that "time is of the essence" as to the deadlines in the agreement, specifically including the deadline in which DVD is to vacate the Premises.[13] Even if this were not so, New York landlord-tenant case law would not avail the Goonetillekes. Where an agreement sets a defined deadline, the contractual word "timely" has been held to connote action within that defined time frame. *See, e.g., Corona Grill Corp. v. 1029 Sixth, LLC,* 11 A.D.3d 282, 283, 782 N.Y.S.2d 723 (1st Dep't 2004) ("tenant failed to fulfill its promise to timely vacate" where its subtenant failed to vacate by the specified lease termination date); *Federal Realty Ltd. P'ship v. Choices Women's Med. Ctr.,* 289 A.D.2d 439, 440, 442, 735 N.Y.S.2d 159 (2d Dep't 2001) (tenant did not "timely surrender the premises" when tenant surrendered the leased premises after date that lease expired); *cf. Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC,* 30 A.D.3d 1, 6–7, 811 N.Y.S.2d 47 (1st Dep't 2006).[14]

---

13. The Stipulation states that " 'TIME IS OF THE ESSENCE' for [DVD and defendants] to comply with the terms and conditions of this stipulation" and "that there is no such five (5) day grace period for … the date of [DVD] to vacate." Stipulation ¶ 13 (capitalization and emphasis in original). The Stipulation governs the terms of the Lease and the Guaranty. *See* Stipulation ¶ 9.

14. For this reason, even if Thor's notice of termination had been void and the deadline to vacate had been set by DVD's notice to vacate, DVD's surrender of the premises was

In any event, even if a modest deviation from the deadline to vacate were compatible with the contractual requirement of a "timely" surrender of the premises, a 68–day surrender falls outside any such grace period. And, to the extent that the reasonableness of such a missed deadline to vacate would be evaluated not in a vacuum but in light of the surrounding circumstances, the record is devoid of evidence justifying DVD's missing that deadline, let alone by approximately two months. There was, for example, no evidence adduced that the tenant was physically or medically incapacitated—on the contrary, DVD was a corporate entity and there is no claim that its principals were incapacitated. Nor does the summary judgment record contain evidence that Thor had communicated to DVD an extension of the deadline to vacate.[15]

DVD therefore failed to "timely" vacate the Premises. The Goonetillekes' guaranty of their debt to Thor was, therefore, not excused under Paragraph 4.

■ Separately, Paragraph 4 required that DVD vacate the Premises "otherwise in accordance with the Occupancy Agreement." Under Article 29 of the Lease, which is a component of the Occupancy Agreement,[16] DVD was required to "surrender the Demised Premises to [Thor] upon the expiration or sooner termination of this lease, *vacant and broom clean.*" Lease, Art. 29 (emphasis added). At argument, the Goonetillekes' counsel conceded that DVD did not surrender the Premises in such condition. Tr. 31–39. That concession is supported by the summary judgment record: The parties have stipulated, and photographic evidence confirms, that when DVD surrendered the Premises, it left behind nine or 10 television screens, a refrigerator, metal shelving fixtures, about 50 units of DVD players, and boxes of merchandise. Joint 56.1 ¶ 91; *see also id.* at Exs. 13–14; Tr. 38 (defense counsel's acknowledgment that the Premises "were not a hundred percent vacant and broom clean").[17]

■ For this reason too, under Paragraph 4, the Goonetillekes were not released from the Guaranty.[18]

still untimely, coming seven days after the July 7, 2014 date set in the notice to vacate.

**15.** At argument, defense counsel was invited to state what "measuring stick" the Goonetillekes would use to measure timeliness, if not the deadline in the agreement, and whether any case law supported defendants' claim. Defense counsel stated that the Court could look to case law as to the timeliness of an alien's application contesting removal from the United States, but acknowledged that there is "no definition" of timeliness. Ultimately, defense counsel stated that while missing the contractual deadline by 68 days would be reasonable, missing it by a year would not be. Tr. 41–42.

**16.** The Amendment provides that the Occupancy Agreement, which consists of the Lease, Stipulation, and Addendum, "represents the entire agreement between the parties as to the Premises, and has not been amended, modified, or supplemented, except as … set forth" in the Amendment. Amendment at 1.

**17.** Under the Amendment, the requirement that the Premises be left "vacant and broom clean," of course, equally applied to a surrender of the Premises pursuant to a tenant's notice to vacate. Therefore, even if Thor's notice of termination were held void, the Goonetillekes cannot claim to have been released from the Guaranty.

**18.** In an attempt to avoid the contractual requirement that DVD leave the Premises "vacant and broom clean," the Goonetillekes claim that Thor abandoned the right to enforce the Occupancy Agreement when, on July 2, 2014, with DVD still occupying the Premises, Thor brought this suit upon the Guaranty. The Goonetillekes appear to argue that, assuming that DVD's notice to vacate and not Thor's termination notice was controlling, Thor anticipatorily repudiated the

### 3. Enforcing the Guaranty does not work an impermissible forfeiture

█ In a final argument against liability, the Goonetillekes argue that to award more than $2 million to Thor for breach of the Guaranty would be inequitable and constitute an impermissible forfeiture. Defs. Br. 11–14, 24–29; Defs. Reply Br. 2, 8, 10–11, 13–17. The Goonetillekes argue that, particularly because the $2 million includes reversals of conditional rent-reductions, awarding such damages would serve only as a "punitive measure" for "failing to strictly comply with the occupancy agreement." Defs. Reply Br. 15.

The New York Court of Appeals' decision in *Fifty States Management Corp. v. Pioneer Auto Parks*, 46 N.Y.2d 573, 415 N.Y.S.2d 800, 389 N.E.2d 113 (1979), supplies the framework for reviewing this claim. In *Fifty States*, a landlord and a tenant entered into a 20–year commercial lease, under which the tenant was to pay monthly rent. *Id.* at 576, 415 N.Y.S.2d 800, 389 N.E.2d 113. The landlord required a guarantor for the lease, and included a clause in the lease, which gave the landlord the option to accelerate future rent due for the balance of the 20–year lease if the tenant defaulted and the landlord followed certain default notice (and other procedural) requirements. *Id.* After the tenant defaulted on its monthly rent,

the landlord sent an initial default notice and gave the tenant an opportunity to cure. *Id.* The tenant, however, defaulted as to a second month, and the landlord brought suit, seeking the acceleration of rent payments in accordance with the lease. *Id.* On appeal, the tenant challenged enforcement of the acceleration clause as a "penal forfeiture." *Id.*

The Court of Appeals rejected that claim and ruled for the landlord. It acknowledged that "equity will often intervene to prevent a substantial forfeiture occasioned by a trivial or technical breach." *Id.* at 576–77, 415 N.Y.S.2d 800, 389 N.E.2d 113 (citing *J.N.A. Realty Corp. v. Cross Bay Chelsea*, 42 N.Y.2d 392, 397–98, 397 N.Y.S.2d 958, 366 N.E.2d 1313 (1977)). But, it noted, in the "vast majority of instances" involving clauses providing for the acceleration of an entire debt upon the obligor's default, the clauses "ha[d] been enforced at law in accordance with their terms," where there is no "element of fraud, exploitive overreaching or unconscionable conduct on the part of the landlord to exploit a technical breach." *Id.* at 577, 415 N.Y.S.2d 800, 389 N.E.2d 113 (collecting cases). The Court of Appeals also acknowledged that generally, where a lease included an acceleration clause triggered by a breach of any of the lease's terms, that provision would be deemed an

---

Occupancy Agreement. This argument fails. First, Thor's position, which the Court has held correct, is that its termination notice was valid. Far from being anticipatory, Thor's lawsuit, having been brought six weeks or more after DVD had been obliged to vacate, was wholly retrospective. Second, in New York, the doctrine of anticipatory repudiation applies in quite different circumstances: "[W]hen a party repudiates contractual duties prior to the time designated for performance and before all of the consideration has been fulfilled," "the repudiation entitles the nonrepudiating party to claim damages for total

breach." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 462–63, 682 N.Y.S.2d 664, 705 N.E.2d 656 (1998) (citation and internal quotation marks omitted); *see also 200 E. 87th St. Assocs. v. MTS, Inc.*, 793 F.Supp. 1237, 1253 (S.D.N.Y.1992). But that does not describe Thor's conduct. Thor filed this lawsuit believing, correctly, that it had terminated the Occupancy Agreement weeks earlier. And the Goonetillekes admit that DVD was by then in default, and do not identify any contractual duties that Thor, by bringing this lawsuit to seek recovery for DVD's breach, abandoned.

"unconscionable penalty and will not be enforced by a court of equity." *Id.*

However, the Court of Appeals noted, the case at hand did not present such a scenario. The tenant's breach consisted of a default of monthly rental payments, which "is an essential part of the bargain as it represents the consideration to be received for permitting the tenant to remain in possession of the property of the landlord." *Id.* at 578, 415 N.Y.S.2d 800, 389 N.E.2d 113. And, the Court of Appeals noted, "[t]here can be no claim that the sum reserved under the acceleration clause here bears no relationship to the damages sustained by landlord as a result of the breach." *Id.* at 578, 415 N.Y.S.2d 800, 389 N.E.2d 113. As the Court of Appeals explained, once the tenant defaulted on its first monthly rent, the landlord, through the acceleration clause, "was merely afforded its contractual option to receive the rental payments reserved for the remainder of the lease term as a condition of defendant's continued occupancy." *Id.* And because the tenant had not attempted to cure its first default with respect to monthly rent and instead defaulted again the following month, "[i]t would be a perversion of equitable principles to relieve a party of the impact of its intentional default." *Id.* at 579, 415 N.Y.S.2d 800, 389 N.E.2d 113. The Court of Appeals thereby rejected the tenant's argument that accelerating the entire debt was a forfeiture, and enforced the acceleration clause. *Id.* And, while recognizing that enforcing the acceleration clause could cause the tenant fiscal hardship, the Court of Appeals held that that "does not, standing alone, serve as a basis for construing the acceleration clause as a penalty under the guise of applying equitable principles to a routine commercial transaction." *Id.* at 579, 415 N.Y.S.2d 800, 389 N.E.2d 113.

The decision in *Fifty States* compels rejection of the Goonetillekes' claim of an improper forfeiture. To begin with, Thor does not seek here to enforce an accelerated rent clause. While the Occupancy Agreement contained such a provision, Thor has elected not to seek such relief against the guarantors.[19] The relief Thor seeks is entirely retrospective and compensatory. It consists of back-rent and of rent-reductions (and reduced payments towards real-estate taxes) that the prior landlord had extended to DVD, in the middle of the lease term, in consideration of DVD's continued tenancy and compliance with the terms of the Occupancy Agreement. *See* Addendum 1–2; Lease Art. 6.[20]

---

19. Under the Occupancy Agreement:

No expiration or termination of this Lease pursuant to [an Event of Default] ... shall relieve Tenant of any of its liabilities and obligations hereunder, including without limitation the liability for Rent and additional rent for the entire stated term of this Lease, all of which shall survive such expiration, termination, repossession and/or reletting of any of the Demised Premises.

Lease Art. 18.E. At argument, Thor's counsel explained that Thor had elected to forego this relief, and to pursue the guarantors solely for debts traceable to the period ending July 14, 2014. Tr. 27.

20. In 2009, in settling the landlord-tenant lawsuit, the prior landlord, defendants, and DVD executed the Addendum, which reduced rent to $420,000 per year for the period beginning May 1, 2009 through April 30, 2010; rent for that period had previously been $556,451.52 under the Lease. *See* Lease Art. 4. Rent for each succeeding year was to increase by 3%, compounded. Addendum at 2. The modified rent also was inclusive of all taxes, *id.* at 1–2, whereas under the original terms of the Lease, taxes were to be collected separately from rent, *see* Lease Art. 6. But the Addendum provides, upon an Event of Default, "the Rent and taxes as set forth in the Lease shall be deemed to be reinstated, without regard to modification of same as herein set forth; and ... a sum equal to the difference between the original rent and taxes set forth in the Lease, without regard to the with-

DVD did not, however, meet those conditions. There is nothing penal, or inequitable, whatsoever in holding DVD, or its closely related guarantors, the Goonetillekes, to those terms.

Further, even more than in *Fifty States*, the tenant—and the guarantor—had extended opportunities to cure before the lease was terminated, triggering the concomitant contractual consequences. DVD defaulted on its monthly rental payments, for two months; Thor sent DVD two default notices, although the Occupancy Agreement did not oblige it to do so; and abided a growing back-rent tab before invoking its right, under the Occupancy Agreement, to notify DVD of Thor's termination of the Occupancy Agreement. The Goonetillekes do not allege that they or DVD, in negotiating the Occupancy Agreement and Amendment, were defrauded, exploited, or treated unconscionably by Thor (or its predecessor landlord).

The Court accordingly rejects the Goonetillekes' claim of an impermissible forfeiture. Imposition of guarantor liability on them for the $2,067,288.99 of past-due rent, rent reductions, and real-estate taxes, which DVD owed to Thor after its defaults and termination, was "merely the contracted-for financial consequence of the tenants' own failure to do that which they promised to do." *1029 Sixth, LLC v. Riniv Corp.*, 9 A.D.3d 142, 150, 777 N.Y.S.2d 122 (1st Dep't 2004).

Accordingly, the Court grants Thor's motion for summary judgment on its breach of guaranty claim, and denies the Goonetillekes' motion for summary judgment on that claim. The Court finds that the Goonetillekes owe—and have not paid—Thor $2,067,288.99 in rent arrears, past-rent reductions, and real-estate taxes.

in modification of same, from and after May 1, 2009 shall become immediately due and

## CONCLUSION

For the reasons set forth above, the Court grants Thor's motion for summary judgment on its breach of guaranty claim, and denies the Goonetillekes' motion for summary judgment on that claim. The Goonetillekes are liable to Thor on that claim for $2,067,288.99.

The Court further directs Thor to submit a letter by October 7, 2015, notifying the Court as to whether it intends to pursue its separate costs of enforcement claim; if so, in what manner and on what timetable; and whether there are any additional matters that the Court must address before closing the case. Defendants are directed to respond by letter by October 14, 2015.

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 67 and 74.

SO ORDERED.